Plaintiff, the widow of Thomas A. Arrington, deceased, brings this suit against the Singer Sewing Machine Company, employer of deceased, to recover workmen's compensation at the rate of $19.50 per week for three hundred weeks, and medical and funeral expenses.
It is alleged that during the forenoon of March 25, 1941, the deceased, while performing the duties of his employment, sustained an accident from the effects of which he died the third day thereafter. After alleging that deceased stopped his automobile on a road, some two hundred yards from the residence of George Gipson, a customer, whom he desired to see, and then climbing through a barbed wire fence, plaintiff further alleged: "* * * that in returning, after seeing said customer * * * and while climbing and crawling through the said barbed wire fence to return to his car * * * deceased accidentally became hung on said barbed wire fence, which caused him to stumble, strain, fall, swing and trip in such a manner that serious and grievous injury resulted; that said accidental injuries included the rupture, tearing and injury to certain internal organs and tissues, and particularly to the organ or tissue known as the mesentery, and to blood vessels of a vital nature which resulted in the death of deceased, through internal bleeding or hemorrhaging * * *".
Defendant resisted the suit in the court below and here on these grounds, to-wit:
That deceased did not experience an accident while discharging the duties of his employment in the manner nor at the time and place alleged upon nor otherwise; but, if it should be found and held that the proof warrants the conclusion that deceased suffered an accident at the time and place alleged, there was no causal connection whatever between the accident and his death; that the accident did not to any extent contribute to his death.
The case was tried before Judge J.H. Stephens of the First Judicial District, but was decided by Judge Enos C. McClendon of the Third Judicial District, who, under assignment of the Supreme Court during Judge Stephens' absence on account of illness, acted in his place.
Plaintiff's demand was rejected and her suit dismissed. She prosecutes this appeal.
Questions of fact only are involved. Appellants stress the fact that the judge who decided the case did not see and hear *Page 146 
the witnesses as they testified, and from this it is argued that the usual weight to be accredited to a judge's conclusions on questions of fact should not be accorded in this instance. We have given the case our best attention and consideration, and have not allowed the lower court's judgment to have more influence upon us than it justly deserves.
The deceased lived in the southern portion of the City of Shreveport. He had been in defendant's employ for over thirty years. He left home about eight o'clock the morning of March 25th, telling his wife he was going into the country to make collections and might not be home for the midday meal. He called on Mr. Gipson who lived several miles below the City, at about the hour of 9:30 o'clock in the hope of making a collection. To reach Gipson's home, the deceased, after parking his car on the road, climbed a barbed wire fence of four strands, which crossed a well-beaten path that led directly to Gipson's home. On one side of the path the wires were affixed to a post and on the other side to a tree. The intervening distance is about ten feet. The strands are from twelve to eighteen inches apart and sagged some from use.
The alleged accident occurred on the return trip from Gipson's residence. To get through the fence a right-handed man (as was the deceased) would depress with his hand or hands the second strand from the ground. This gave clearance of about twenty inches. While the wire was thus depressed the right leg would be lifted over while the weight of the body rested upon the left leg and to some extent upon the hand or hands holding the wire. This finished, the person would be astride the wire. The left leg would then be lifted over the wire while the right leg and the hand or hands on the wire sustained the body's weight.
There were no witnesses to the alleged accident. All we know about it is what the deceased told his wife on his return home that afternoon. This was purely hearsay, but was admissible under the Employers' Liability Act No. 20 of 1914, Sec. 18, subd. 4, as amended, Act No. 85 of 1926, which reads: "The Judge shall not be bound by technical rules of evidence or by technical rules or (of) procedure other than as herein provided, but all findings of the fact must be based upon competent evidence * * *."
This law provides the basis for an exception to the general rule barring hearsay testimony.
Following the alleged accident Mr. Arrington continued to contact customers to make collections. For nearly two hours immediately thereafter the record does not reveal his whereabouts. About 11:15 o'clock he made a social call at the store of his close friend, Mr. J.C. Webb, some five and one-half miles from the Gipson home and seven miles from deceased's residence. While there Mr. Webb complimented the suit of clothes deceased was wearing (which was a present to him from defendant) and he remarked that he had cut a slit in one of the cuffs of the trousers while getting through a wire fence, but Mr. Webb could not recall which leg the slit was in, although he saw it. At this time the deceased's physical appearance and actions were normal. He made no complaint of pain nor did he comment on tearing the trousers beyond what is said above, other than to state that he had previously torn the pants above one of the pockets at defendant's storeroom. This tear was also observed by Mr. Webb.
The deceased next appeared at the store of Mr. E.L. Ray, south of Shreveport, between 1:30 and 2 o'clock and made a collection on account from him. The two talked for about twenty minutes. The deceased made no complaint concerning his physical condition nor did he refer to the tearing of his trousers. Mr. Ray said his appearance was normal; his own words being: "Exactly as usual, I thought."
The last call made by the deceased that day was at the residence of Mrs. E.A. Connell, six miles north of Shreveport. To her he "looked as usual". Prior to making this call he 'phoned Mrs. Connell to ask if she was in a position to make the monthly payment on her account. She was unable to fix the time of the call, but it is definitely proven that this call was subsequent to that made on Ray.
It is evident from the record that in point of time there is error on the part of some of the witnesses. Mr. Ray is quite certain the deceased was at his place after 1:30 o'clock but adds that deceased told him he would next call on a customer on the Robinson Place. Gipson lives on this place and he testified that Arrington came to his home at about the hour of 9:30 o'clock A.M. Mr. Webb is equally *Page 147 
certain the deceased was at his store at around 11:15 o'clock A.M. It is quite certain he was there after seeing Gipson. To add to this confusion as regards the time factor, plaintiff's recollection is that the deceased arrived back home at about 1:30 o'clock. More than a year elapsed between the death of Mr. Arrington and trial of the case. It is not surprising that discrepancies of this character should appear.
Plaintiff testified that when deceased returned home he was pale, looked badly, and said to her that he thought he had hurt himself climbing through a barbed wire fence; "that he cut his pants and shook his leg trying to get loose to keep from tearing that suit of clothes"; that he strained and hurt himself. He was then complaining of pain in his back and side which, he said, manifested itself immediately after going through the fence. He rested in bed for one and one-half hours and then got in his car and drove some five miles to his office. He soon returned to his home, still complaining of the pains which had grown worse. Plaintiff gave him some medicine which brought no relief. He ate a small quantity of gumbo and retired for the night, which was restless.
Plaintiff testified that deceased arose the following morning (Wednesday, 26th) at an early hour as was his habit, dressed, ate breakfast and drove away, saying he was going to his office, although he felt quite badly. He was gone only one hour. On his return home he went to bed at once. An electric lamp which had given relief previously to back pains was again applied, but this did not abate the pains. Dr. Pou, the family physician, was promptly summoned. He found the deceased suffering intense diffused abdominal pains which grew worse. The abdomen was tense. Two hypodermics of sedatives brought no relief. The doctor left after giving the second one, but returned a short time thereafter and finding that the pains had grown much worse, advised the deceased to go to a sanitarium. He was then in a state of shock due to circulatory collapse.
Dr. Pou at first thought the appendix had ruptured but later decided that a hemorrhage of some kind was in progress. This diagnosis was supported by low blood pressure reading. Consultation by several physicians at the sanitarium resulted in a decision to operate. They felt that death was inevitable if no operation was performed. It revealed a copious quantity of free blood in the abdominal cavity, two rents in the mesentery and a large bloody mass in the aorta behind the peritoneum near the left kidney. The blood was removed, the rents sutured and the body closed. The patient died at 1:24 o'clock Friday morning, March 28th, and was buried.
With the family's consent, the body was exhumed on April 8th for an autopsy. It was conducted by Dr. W.R. Matthews, a pathologist, in the presence of several other physicians. It revealed that the immediate cause of death was hemorrhage from the rupture of an abdominal aneurysm four inches wide and six inches long in the lower portion of the abdominal aorta. It was of long standing and had progressed to an advanced stage. The conclusion was reached by Dr. Matthews and other physicians that the aneurysm was of arteriosclerotic origin; that is, it was caused by high blood pressure. The heart was abnormally large.
Plaintiff contends that in disengaging the trousers leg from the wire, the deceased experienced muscular strain which produced one of two effects, to-wit:
1. Rupture of the aneurysm then and there, or
2. Increase in the blood pressure to the degree that conditions in and about the aneurysm were so aggravated and activated as to later cause the rupture.
In 1940 the deceased had a serious illness which was diagnosed as arthritis of the spine. The pain from this ailment was so intense and continuous as to force him to remain at home and lie upon a hard bed for some time. Thereafter, he frequently complained of back pains and used an electric lamp to relieve them. These pains were in the same locality as were those felt by the deceased when he returned home the afternoon of March 25th. He did not then complain of pain in the abdomen.
On March 21st, one week prior to his death, the deceased and plaintiff motored to New Orleans. He operated the car. They returned on March 23rd. The following day he went about his business as usual, employing part of the afternoon in hoeing his garden.
We are not convinced from the paucity of testimony bearing thereon that the deceased *Page 148 
sustained strain while going through the fence sufficient to amount to an accident. He did not say and it is not contended that he lost balance and fell upon the wire. The most that happened was the trousers caught in a barb as the leg was transferred from one side of the fence to the other and the tear occurred in the transfer, or it occurred when deceased pulled or jerked his leg after realizing that his pants had caught in the barb.
There is nothing in the record to sustain the allegations that deceased struggled to release the pants leg from the wire. He was sixty-one years of age, five feet, eleven inches in height, and weighed two hundred pounds. Had he lost balance and fallen upon the wire or ground or struggled, as is alleged, surely there would have resulted physical evidence thereof in addition to the small tear in the trousers. As the deceased did not tell Mr. Webb or other persons he contacted firstly after the fence incident, that he sustained injury in a strain while passing through the fence, the inference arises therefrom that at those times he did not consider the incident serious.
But conceding arguendo that deceased did experience a strain at the fence adequate to constitute an accident within the meaning of that term as laid down in the Employers' Liability Act, we are of the opinion that plaintiff's case must fail because the decided preponderance of the mass of medical testimony adduced is against her contention. This preponderance supports defendant's position that there was no causal connection between the accident and the death of Mr. Arrington.
"An aneurysm is a sac formed by the dilatation of the walls of an artery and filled with blood." "The mesentery is a membrane made up of folds of peritoneum (a strong, colorless, shiny membrane with a smooth surface, which lines the inner abdominal walls and covers the organs in the abdomen). It extends from the lower end of the duodenum to the beginning of the large intestine. It supports and covers the ileum and jejunum, two divisions of the small intestines."
The aorta is the largest artery of the body and courses down the inner side of the spine. At the locus of the aneurysm here discussed, it is one inch in diameter.
The free flow of blood from the aperture in the aneurysm was prevented by the peritoneum and the mesentery. Before the blood could enter the cavity the pressure thereof had to be sufficient to break through these substances. This accounts for death not having immediately followed the rupture of the aneurysm on Wednesday afternoon.
When an aneurysm in the thoracic cavity ruptures death from hemorrhage ensues instantly, but if in the abdominal cavity where the flow is retarded by the peritoneum and the mesentery, the patient may linger for hours, — even a day or two.
The record in this case is replete with testimony of an array of physicians whose ability and experience in the fields of medicine and surgery stand second to none in this section of the country. At least two of them stand unusually high as pathologists. This testimony, without serious dissent, establishes that had the aneurysm ruptured when deceased hung his pants leg on the fence, the shock would have been so great that he would not have been able to get to his car, a few yards away.
The testimony of these physicians, while not unanimous on the question, heavily preponderates in favor of the contention that if the deceased did strain himself while getting through the fence, sufficient to cause rise in the blood pressure, this fact did not hasten rupture of the aneurysm nor aggravate nor activate dormant conditions to the extent that rupture followed.
It is certain a person who possesses an aneurysm located as was the one in this case, is doomed to certain death therefrom unless death occurs from an intervening cause. Its progress and development are slow. The walls gradually grow thinner from expansion through the accumulation of blood. The rupture does not come on gradually. The walls break or tear and hemorrhage follows. The indubitable symptoms of the debacle are serious abdominal pains, paleness and shock from circulatory collapse. The rupture may occur while the possessor is asleep, hoeing, walking or operating an automobile, etc.
We are convinced that the rupture had just occurred when Dr. Pou was summoned. The symptoms then evident clearly indicated that such had happened. The *Page 149 
presence of free blood in the cavity supports the opinion that the rupture had not existed very long.
The record in this case is unusually voluminous. The testimony alone consists of four hundred ninety pages. Both sides in briefs and oral arguments have presented their respective positions ably and well. However, as the case turns upon resolution of factual issues, there appears no good reason for complete analyzation of the testimony. It would only serve to encumber and enlarge this opinion without promoting any useful purpose.
Plaintiff has failed to make out her case. The burden in cases of this character is not unlike that in other civil cases, — it rests upon plaintiff.
For the reasons herein assigned, the judgment appealed from is affirmed at the cost of appellant.