(No. 46754.—

ILLINOIS INSTITUTE OF TECHNOLOGY, Appellee, v. THE INDUSTRIAL COMMISSION *et al.*—(Levolia L. Logan *et al.*, Appellants.)

*Opinion filed January 30, 1975.*

J. Michael Madda, of Chicago (Charles Wolff, of counsel), for appellants.

Merrick & Van Driska, of Chicago (Hubert C. Merrick, of counsel), for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

Claimant, Levolia L. Logan, sought an award of workmen's compensation for injuries purportedly arising out of and in the course of her deceased husband's employment at the Illinois Institute of Technology (IIT). The arbitrator granted the award, and the decision was sustained by the Industrial Commission. On *certiorari* to the circuit court of Cook County the Commission's decision was set aside as contrary to the manifest weight of the evidence, and claimant appeals to this court (50 Ill.2d R. 302(a)), principally contending that the circuit court's evidentiary evaluation was erroneous.

Claimant's husband, Herbert Logan, who was 33 years old at the time of his death, worked as a laboratory technician at IIT from 1959 until he was admitted to a hospital on January 10, 1966, where he died about one month later. The autopsy report listed the cause of death as a ruptured aneurysm in the right anterior cerebral artery at its junction with the anterior communicating artery in the circle of Willis.

Bernard Miesczkuc, a microbiologist and a director of certain projects at IIT, testified that Logan worked as his technician beginning in 1960 until his death. During this period a series of experiments were conducted that were designed to investigate the effects of a space-cabin form of environment on animals and their susceptibility to infection at prescribed altitudes. Used in conjunction with the experimentation was a chamber apparatus designed to simulate various altitudes. Miesczkuc described the device in a research paper he co-authored.

"The high altitude environmental chamber used for exposure of the mice to a simulated space cabin environment consists of 2 connected compartments, the main chamber and the air lock, each approximately a 6-foot cube. The main chamber can attain a 20,000-foot altitude in 5 minutes and 150,000 feet in 30 minutes. The temperature range is -10 C to +93 C. The relative humidity is automatically controlled at ambient temperatures in the range of 20% to 90%. Circular chart recorders monitor the altitude and the temperature of the dry bulb and the wet bulb in the main chamber. A communication system consisting of microphones, speakers and amplifiers is provided. The oxygen system consists of a 2-bottle manifold located outside the chamber and connected to the interior of the chamber and the air lock. Standard diluter demand type regulators are used. Analyzers in combination with recording devices continuously monitor the concentrations of oxygen and carbon dioxide in the chamber."

In 1961-1962 Miesczkuc stated that experimentation was conducted at a simulated level of 18,000 feet. From 1962 to the spring of 1965 a 35,000-foot altitude was maintained, and in the latter part of 1965 experiments at a 27,000-foot level were conducted in conjunction with the National Aeronautics and Space Administration.

During the experiments, Logan and others would regularly go into the inner chamber to care for the animals as well as for technical purposes, although it would appear that Logan's entries during 1964-1965 became less frequent due to the fact that several animal caretakers were hired. Miesczkuc explained that no problem was encountered when entering this chamber if the altitude in the inner chamber was maintained at about 18,000 feet or lower. However, as the simulated altitude was increased, an individual would remain in the air lock or antechamber until the air pressure in this area could be equalized with the lower pressure in the inner chamber by means of a vacuum process. When the air pressure was equalized, the individual would then enter the inner chamber by means of a door between the two areas. In the course of this

equalization process and in performing the subsequent work, the person would wear a mask enabling him to breathe pure oxygen. Another party, who was outside the chamber, would monitor the necessary controls. It was testified that a person would usually remain in the antechamber for about one-half hour and then work that same period of time or much longer in the inner chamber. When the work was completed, the person would return to the antechamber and air would be slowly let into this area for 10 minutes or more until the pressure equaled ground-level pressure.

Miesczkuc stated that a series of experiments was completed about December 22, 1965, and a new series did not commence until after Logan's death. He saw Logan on January 10, 1966, operating the chamber controls while someone else was inside. Miesczkuc recalled that the last time Logan entered the chamber was about three weeks prior to his hospitalization.

Several of Logan's co-workers testified as to their experiences with the high-altitude simulator. Catherine Nathan, a microbiologist, said that Logan would remain in the antechamber for 30-45 minutes before entering the inner area. She said that on several occasions during 1963-1964 when they worked together Logan complained of pain in his joints and pressure on his ears. Glen Jedlicka, another scientist, stated that the acclimatization process in the antechamber would take up to an hour. Jedlicka said that he felt nauseated when he was inside the chamber. Miesczkuc testified that he did get a pain in his knee joint at one time and Logan made similar complaints on no more than two occasions.

Claimant testified that her husband had entered the chamber just before Christmas in 1965 and he complained of dizziness and a headache that evening. She further said that her husband had suffered from headaches for some time before his death and that he was exhausted after working in the chamber.

Dr. Donald Atlas, who specialized in cardiology and internal medicine, testified on behalf of claimant. He had no prior experience in high- or low-altitude experiments. This physician explained that an aneurysm is a congenital defect and an ordinary disease of life that is not unusual. This condition is a weakening of the artery which eventually leaks, may then clot, and finally ruptures. He explained that Logan's recent headaches might have indicated that the aneurysm had started to leak.

In response to a hypothetical question, Dr. Atlas expressed the view that the rupture of the aneurysm at this particular time might have been causally related to Logan's employment, which could have contributed to and accelerated the fatal rupture. He based his opinion upon the rapid decrease in atmospheric pressure experienced by Logan while working in the altitude chamber under simulated conditions, and he equated the situation to one who experiences the bends (dysbarism). This condition was most evident by release of nitrogen into tissue located near the knee joints and in the hands that could cause great pain. The rapid decrease in pressure resulting from greater simulated altitudes would also release nitrogen in a gaseous state from the blood. The nitrogen bubbles would further weaken the aneurysm, causing it to deteriorate faster and rupture sooner. Dr. Atlas conceded that he had no experimental basis to substantiate his conclusion as to causal relationship, nor had he any knowledge of documented cases to support his position. And he admitted that the aneurysm could have ruptured naturally. He was unable to answer whether breathing pure oxygen would tend to eliminate nitrogen bubbles that could be caused by a lessening of atmospheric pressure.

Dr. Paul Kelly, a former Air Force flight surgeon and the present medical director of IIT, testified that he performed an annual "high altitude physical" on Logan in April, 1965, and discerned nothing that would have disqualified Logan from participation in the high-altitude

experiments. He was of the opinion that no causal relationship existed, because the nitrogen would have been "washed out" of the blood by breathing pure oxygen, thus alleviating the possibility of developing the bends.

Dr. Daniel Ruge, a board-certified neurological surgeon, testified before the Commission. This witness treated Logan at the hospital prior to his death. He said that aneurysms of this nature often were found in men of Logan's age group. He explained that an arterial aneurysm was a defect resulting in a weakness of the outer muscular coat (adventitia) of the arterial wall which probably develops as a person ages. Dr. Ruge refused to express an opinion as to the relationship of Logan's employment to his death, although he did say the formation of the aneurysm was not caused by work in the high-altitude simulator.

Dr. William Buckingham, who specialized in internal medicine, was called by IIT. In response to a hypothetical question, this physician stated that Logan had died as a result of the natural course of a disease and there was no relationship between his death and the work in a high-altitude chamber which could cause an aneurysm to leak. By utilizing the preparatory procedures during the decrease in pressure, Dr. Buckingham was of the opinion that the simulated altutude would not produce, aggravate or cause any damage to a congenital defect in the artery. He said that the artery was improperly formed at birth and blood worked through the weakened portion of the artery with the passage of time. Simply stated, the artery would just wear out. He could not say whether headaches are a definite sign of an intercranial aneurysm.

Dr. Buckingham indicated that his research encompassed study of the composition of arterial blood gases, although he had not done any research in circulatory adaptation to high altitudes. He expressed the view that breathing oxygen during the high-altitude-simulation procedure would counter the nitrogen in the blood, although

a person would have to breathe oxygen for over 30 minutes before the nitrogen concentration in the blood would decrease, and many hours would be needed to "wash out" the nitrogen entirely. However, he denied that nitrogen in the blood would bubble under the circumstances described in the hypothetical question.

Dr. John Marbarger, a physiologist and Director of the University of Illinois Research Resources Laboratory, testified on behalf of IIT. His experience in the field of aviation medicine spanned 20 years, and his work included 9 years' experimentation with simulated altitudes up to 38,000 feet. He never was involved in a situation comparable with the theory advanced by claimant, nor had he ever heard of anyone sustaining a ruptured cerebral aneurysm as a result of reduced atmospheric pressure. He was certain that no causal relationship existed between the type of work Logan did and the aneurysm, because the last time Logan was in the chamber was at least two weeks prior to his hospitalization and any high-altitude effect would develop immediately. While adhering to his opinion as to causal relationship, he said he would be less certain had Logan entered the chamber on the day he was hospitalized.

Dr. Marbarger described the symptoms of reduced pressure as nausea, headache, vomiting, pallor, difficulty in breathing and inability to balance oneself while walking. These symptoms would ordinarily disappear upon return to ground-level pressure or most likely within six hours thereafter. To combat any nitrogen reaction at high altitudes, this witness said that 95% of nitrogen in the blood would be "washed out" by several breaths of pure oxygen, although small bubbles could remain.

Claimant primarily maintains that the record presented a fairly debatable question upon the issue of the causal relationship of her husband's employment to his death based upon qualified medical opinion and under such circumstances the circuit court erred in substituting its

judgment for that of the Industrial Commission. Premised upon the testimony of Dr. Atlas, it is argued that each time Logan entered the high-altitude chamber he lost the safety of a protective blanket of air pressure which ordinarily surrounded his body at ground level, and the absence of such protective air pressure set in motion a series of physiological changes subjecting him to the hazards of the expansion of gases within his body. As part of the process, gases in the blood escaped from solution in the form of air bubbles and caused increased stress upon the already weakened walls of the aneurysm, which produced leakage, bleeding and rupture, culminating in death. Thus claimant asserts that her husband's death was the net product of a successive series of individual but repetitive episodes of injury and, as such, is compensable.

IIT contends that there is no conflict in the medical testimony because the record reflects that the prebreathing of oxygen eliminates the occurrence of the distension of nitrogen as espoused by Dr. Atlas, which he did not take into consideration in his opinion. It notes that three other doctors experienced in high-altitude procedures stated that there could be no causal connection under the conditions set forth in the hypothetical questions and there is really no conflict in the medical testimony in this regard. Thus IIT concludes that the Industrial Commission's determination as to causal relationship was improper and that the circuit court correctly set that decision aside.

Numerous cases have established that a decision of the Industrial Commission resolving the question of causal relationship based upon conflicting medical evidence will not be set aside unless contrary to the manifest weight of the evidence. (*Pontiac Chair Co. v. Industrial Com.*, 59 Ill.2d 251, 266.) We believe that the record permits the reasonable inference to be drawn that those who participated in the high-altitude experimentation were not thoroughly protected from the decrease in atmospheric pressure attendant thereto because they breathed oxygen.

It is clear from the testimony of Catherine Nathan that Logan experienced pain in the joints on several occasions during a period when experiments were conducted at the 35,000-foot level. Miesczkuc admitted that he too experienced such pain on one occasion, and Logan similarly complained possibly several times to him. These instances would tend to indicate that nitrogen had entered the tissue in the affected areas. Glen Jedlicka became nauseous while working in the chamber, and Logan had told claimant that he was dizzy at times. As indicated by Dr. Marbarger, these conditions were symptomatic of reduced atmospheric pressure. The record does not prove that the breathing of oxygen would totally eliminate any repercussion from a rapid change in such pressure. Thus the testimony of the medical witnesses called by IIT was not fully determinative of the issue of causal connection and a conflict in medical opinion existed as to whether the repeated changes in atmospheric pressure aggravated or accelerated the deterioration and eventual rupture of the pre-existing aneurysm. From the record, we cannot say that the Industrial Commission's decision was contrary to the manifest weight of the evidence.

IIT has further argued that claimant failed to prove a date of injury. The arbitrator found that Logan sustained accidental injuries on January 10, 1966, the date originally alleged in the application for adjustment of claim, but the Industrial Commission, in sustaining the award, modified the date of injury to December 28, 1965. Citing *International Harvester Co. v. Industrial Com.*, 56 Ill.2d 84, IIT contends that the occurrence of an accident requires proof of a definite time, place and cause and that the evidence fails to support an accidental injury on either of the aforesaid dates or any other date.

Claimant does not dispute the correctness of IIT's position that the evidence fails to sustain that an injury occurred on either date specified by the arbitrator or Industrial Commission. Rather claimant asserts that under

the circumstances proof of an exact date of injury is unnecessary, particularly when IIT was unable to produce various log books which would have indicated when Logan entered the altitude chamber.

The present case is dissimilar to the *Harvester* decision in that there is no indication that Logan was aware of his condition prior to hospitalization, which resulted from a sudden disablement on January 10, 1966. Moreover, the testimony of Dr. Kelly indicated that an aneurysm could be detected by means of an angiogram, a very serious medical procedure. Other medical testimony, as well as matters contained in the hospital records, indicated that an aneurysm might leak and then clot before a fatal rupture might occur, and Dr. Atlas stated that the headaches Logan experienced at a time he was still entering the altitude chamber could have been an indication of this leakage. There is sufficient evidence to conclude that Logan's condition developed over a period of time (*cf. Ajax Buff Co. v. Industrial Com.,* 56 Ill.2d 575, 580-81, and authorities cited therein), and under the unusual circumstances of this case we find that the discrepancy concerning the date of injury does not preclude an award where there is no claim presently advanced specifically concerning timely notice of the injury.

Accordingly, the judgment of the circuit court of Cook County is reversed and the award entered by the Industrial Commission is reinstated.

*Judgment reversed; award reinstated.*