430 So.2d 1072 (1983)
Thomas L. FRUGE
v.
FIRST CONTINENTAL LIFE AND ACCIDENT INSURANCE COMPANY.
No. 13236.
Court of Appeal of Louisiana, Fourth Circuit.
March 9, 1983.
Rehearing Denied May 24, 1983.
*1073 Jerald N. Andry, New Orleans, for plaintiff-appellee.
Samuel Richard Exnicios, New Orleans, for defendant-appellant.
Before BARRY, LOBRANO and WILLIAMS, JJ.
WILLIAMS, Judge.
This is an appeal by defendant, First Continental Life and Accident Insurance Company, from a judgment awarding the survivors of plaintiff, Thomas L. Fruge, $5,400.00 under a disability income insurance policy purchased from defendant.
The disability income insurance policy plaintiff bought was entitled "Med-Income Plan," and was designed to provide income of $100.00 per week, up to a maximum of 100 weeks, to the insured or his family in the event that the insured was confined to a hospital. The effective date of the policy was May 15, 1972.
There were three types of hospital confinement which qualified an insured to claim benefits under the policy: (1) confinement due to accidental bodily injury (policy paragraph "A"); (2) confinement due to sickness that commences thirty (30) days after the effective date, except for sickness or illness with regard to the heart or circulatory system, and in such cases, the coverage would only begin six (6) months after the effective date of the policy (policy paragraph "B") and, (3) coverage for pregnancy of an insured which is not relevant in the instant case.
On May 31, 1972, decedent, at the time of his illness, was employed as a land-based worker in the maritime industry. He was working aboard a vessel below decks and in high temperatures. There was some evidence that he was using a gas torch to heat some part of the vessel so he could work on it. The stipulated record is not clear as to the exact task in which decedent was engaged. Later medical reports, contained in the record, explain that decedent began experiencing headaches and dizzy spells in the morning and that he lost consciousness, but did not know for how long. He was discovered by a co-worker before noon. Decedent did not work the rest of that day, but *1074 instead sought medical help. There was no evidence in the record indicating there had been a work incident which may have precipitated plaintiff's loss of consciousness.
Decedent visited Dr. Richard T. Green on May 31, 1972, with symptoms of weakness, heat exposure, severe occipital headache, nausea, and some episodes of stiff neck. No definite diagnosis was made by Dr. Green. Decedent was treated conservatively and was instructed to return on each of the next two days (June 1st and 2nd). No improvement was noted, and Dr. Green had an increased suspicion of developing intracranial pressure. Dr. Green recommended decedent be admitted to Touro Infirmary in New Orleans. The record indicates the admitting diagnosis was a possible subdural hematoma, or in laymen's terms, an accumulation of bleeding from within the head. After several tests were performed, a neurosurgeon, Dr. W. Randolph Page, was consulted and he performed a lumbar puncture which revealed evidence of fresh bleeding. On June 5, 1972, Dr. Page performed a carotid artery angiogram, thus revealing the presence of an intracranial aneurysm of the anterior cerebral (communicating) artery in the area of the brain known as the "circle of Willis". A craniotomy was performed on June 13, 1972, by Dr. Page, in which he isolated and removed the aneurysm. Decedent's stay in the hospital was for seven and one-half weeks (June 6 through July 26, 1972) until he was released to home care. Fruge later died of causes not identified in the record. His survivors were later substituted as proper parties plaintiff.
A claim for benefits under the disability income policy was made subsequent to decedent's release from the hospital. Defendant denied decedent's claim, and on June 1, 1973, decedent filed suit under the contract of insurance, praying for relief in the amount of $750.00, plus costs, legal interest, penalties and attorney's fees due to defendant's unreasonable denial of decedent's claim.
After some eight years of litigation consisting of several continuances, pre-trial conferences, rules to show cause, two motions for summary judgment by each side and even the retirement and replacement of the original trial judge by his successor, the parties brought this matter to trial. In February, 1981, the parties submitted facts and stipulated evidence to the trial judge to make his decision. The trial court found plaintiffs were entitled to recover $5,400.00 under the disability income policy, but were not entitled to penalties and attorney's fees, finding that there was no unreasonable denial of benefits on the part of the defendant. This judgment was later set aside to consider additional law and evidence submitted by defendant and upon suggesting, in the record, Fruge's death. Upon plaintiffs' motion, decedent's survivors were substituted in the final second judgment, which was the same as the original one. From this judgment defendant appeals and plaintiffs answer the appeal claiming penalties and attorney's fees.
We note initially that, at most, under the terms of the policy, decedent would only be entitled to $100.00 per week while he was confined in the hospital for seven and onehalf weeks, or a possible total of $750.00. We need not consider, however, the correctness of the amount awarded since our interpretation of the contract of insurance and our review of the record indicates that decedent was not covered by the policy by reason of express exclusions in the insurance contract.
Defendant urges that the incident in question is excluded because it was the result of an illness or sickness arising: (1) within thirty (30) days of the effective date of the policy, or (2) it was an illness or disease of the circulatory system and arose within six (6) months of the effective date of the policy. If either of these exclusions is proved to be true, the decedent, therefore, was not covered by this policy.
Plaintiffs, on the other hand, argue the incident was one tantamount to an `accidental bodily injury' and, therefore, compensible regardless of when it arose following the effective date of the policy. To support this argument, plaintiffs' proofs consisted *1075 principally of analogizing the definition of `accidental bodily injury', under the policy, to that definition used under the Workers' Compensation statute(s) of this state La. R.S. 23:1021(6), et seq.
The issue, as we appreciate it, is whether an aneurysm, such as decedent's, is a disease or illness, or is the result of accidental bodily injury. Although plaintiffs argue that aneurysms, heart attacks, strokes, etc., are compensable accidents under the Louisiana Workers' Compensation Act, we find that there is a clear distinction between a claim for Workers' Compensation benefits and insurance benefits under this policy. We are only concerned with its meaning under this Med-Income insurance policy. We conclude therefore, that the meaning of "accident or bodily injury" is that which is understood in its most common usage, that is, as an immediate or traumatic incident inflicted upon the human body causing injury. La.C.C. Art. 1946: Schonberg v. New York Life Insurance Company, 235 La. 461, 104 So.2d 171 (La.1958). From the record, we fail to find that any such accident occurred.
Furthermore, we have concluded that decedent's aneurysm was not the result of an accidental bodily injury. This conclusion becomes more clear once we have examined the malady which afflicted decedent.
Decedent suffered from an aneurysm located on the right anterior communicating artery in the "circle of Willis". It was located just below the brain itself in the subarachnoid space. Aneurysms are characteristically classified as resulting from some form of disease. Bates v. New York Ins. Co., 31 F.Supp. 813 (E.D.La.1940). Arrington v. Singer Sewing Machine Co., 16 So.2d 145 (La.App. 2d Cir.1944) reh. and cert. denied. Jones v. Washington National Insurance Co., 2 So.2d 696 (La.App. 2d Cir. 1941), reh. denied. Research indicates that aneurysms in this area of the brain are often classified as congenital and are the most common type of aneurysm. C.C. Thomas Correlative Neurosurgery 766 (3d Ed.). Their origins are believed to be due to weaknesses in the vessel walls resulting from incomplete dissappearance or atrophy of primitive (embryonic) temporary arteries which lead to the formation of these aneurysms. Id.
Aneurysms are commonly defined to be:
"A sac formed by the dilatation of the weakened walls of an artery, ...." Black's Law Dictionary, p. 79 (rev. 5th Ed.1979). Black's Medical Dictionary defines aneurysm as:
... a dilatation upon an artery due to yeilding of the vessel-wall and gradual stretching by the pressure of the blood... [a] weakening of the wall of an artery... [and] two of the most important causes of weakening of the arterial wall are syphilis and atheroma [atheroma being fatty degeneration of the inner coat of the arteries]... Occasionally they may be due to congenital defects in the arterial wall: the most common site for such aneurysms is the circle of Willis at the base of the brain ... more common in men than in women, and particularly among those who indulge in hard physical labor, such as laborers and stevedores... [and are] a serious disease.... [Emphasis added].
W. Thomson, Black's Medical Dictionary (32d ed. 1979).
Stedman's Medical Dictionary (4th [Lawyers] ed. 1976) defines an intracranial aneurysm as: "... either congenital, post-traumatic, or mycotic [a sepsis-originating aneurysm] aneurysm of the intracranial branches of the carotid or vertebral arterial systems." Aneurysms are also often classified according to their shape or location, e.g., berry, diffuse, fusiform, hernial, peripheral, cerebral, or aortic, etc.
In the stipulated evidence introduced into the record, the medical report of Dr. Green indicated that it was his belief that the events on May 31, 1972, at decedent's place of employment, were not related to the aneurysm or its possible aggravation. This is supported by the lack of any evidence tending to show that the aneurysm may have been caused by an immediate trauma *1076 to the head. Not one of the physicians consulted discovered any evidence indicating an exterior blow to the head which might have caused the aneurysm. This tends to refute any possibility that the aneurysm was the result of any cause other than from disease or congenital origins. We are convinced, as was Dr. Page, the neurosurgeon, that this particular aneurysm was clearly the result of circulatory disease. We are convinced that aneurysms are caused predominantly by circulatory disease and/or from congenital causes. Nothing in our own research or in the evidence on the record indicates that decedent's aneurysm resulted from accidental means.
Our conclusion is further augmented, and in line with, other jurisdictions who have also addressed this same problem; concluding, as we have, that an aneurysm in the "circle of Willis" is a congenital defect. Illinois Institute of Technology v. Industrial Comm'n, 60 Ill.2d 64, 322 N.E.2d 828 (Ill. 1975); Suedel v. North Dakota Workmen's Compensation Bureau, 218 N.W.2d 164 (N.D.1974) reh. denied.
Decedent's diagnosis and subsequent surgery revealed an aneurysm located in the brain on one of the major arteries. No pathology of the aneurysm was performed or placed in evidence that would lead us to believe that decedent's aneurysm may have been the result of syphilis or atheroma. Black's Medical Dictionary, supra. We conclude, therefore, that decedent's aneurysm was a result of a congenital flaw or defect in the arteries supplying blood to the brain which we logically find to be a part of the body's circulatory system.
The "Med-Income Plan" of disability insurance sold by defendant to decedent contains the three types of coverages enumerated above. In addition, it has three specific limitations and exclusions. The two most relevant here are the time periods imposed, which must elapse prior to the insured being covered by the policy. For mere illness or sickness requiring hospital confinement, an insured must have had the policy in force for a minimum of thirty (30) days from the effective date of the policy (May 15, 1972) before the insured would be eligible to claim benefits. Within this exception in the policy, a further exclusion lies, limiting coverage for confinement due to heart or circulatory diseases. For these problems to be covered, they must arise more than six (6) months after the effective date of the policy.
Decedent purchased the policy and it became effective, May 15, 1972. Decedent became ill on May 31, 1972. This illness arose within thirty (30) days of the effective date of the policy and therefore is excluded by the first limitation abovesaid. Additionally, we find that aneurysms of this type are most often a disease of the circulatory system of the human body and, for purposes of this litigation, because the illness or disease manifested itself within six (6) months of the effective date of the policy, it too is excluded from coverage under the second of the limitations mentioned above.
Within the context of this case, we find applicable to the facts herein, the legal principle that a valid insurance policy is a contract between the insured and the insurer and under La.C.C. Art. 1901, as is true of all other contracts, it is the law between them. Hall v. National Life and Accident Insurance Company, 383 So.2d 74 (La.App. 3d Cir.1980); Sholes v. Continental Casualty Co., 196 So.2d 680 (La.App. 4th Cir.) writ ref. 250 La. 899, 199 So.2d 916 (1967). Further, where the language of the policy is clear and free of ambiguity, as it is herein, it constitutes the contract between the parties and must be enforced as written. Hall, supra; Morgan v. State Farm Mutual Automobile Insurance Co., 195 So.2d 648 (La.App. 3d Cir.) writ ref. 250 La. 638, 197 So.2d 897 (1967); see also La.C.C. Arts. 1945-46. The instant policy exclusions are clearly set forth in the text of the contract of insurance and can not be disputed now by the parties. Id. Louisiana law is clear with regard to interpretation of the terms and provisions of a policy, when in dispute, are to be construed in favor of the insured. Schonberg v. New York Life Ins. Co., supra. However, we find here that *1077 there is no conflict in the provisions of this policy and the limitations and exclusions barring defendant's liability are clear. Further, such exclusions are not in violation of public policy. It is well-settled that in the absence of conflict with laws or public policy, insurers have the right to limit their liability and to impose whatever conditions they please upon their obligations under the policy. Oceanonics, Inc. v. Petroleum Distributing Co., 292 So.2d 190 (La.1974); Binder v. McGehee, 393 So.2d 334 (La.App. 1st Cir.1980); writ ref., La., 397 So.2d 1359; Hall, supra; Cormack v. Prudential Ins. Co. of America, 259 So.2d 340 (La.App. 4th Cir. 1972) reh. den.; writ ref., 261 La. 824, 261 So.2d 230 (1972).
Because the trial court's decision of the merits was rendered solely on the basis of documentary evidence, pleadings, and briefs of counsel, we are in the same position as the trial court to properly evaluate the evidence and make findings of fact. Touchdown Real Estate, Inc. v. Holton, Et Al., 426 So.2d 701 (La.App. 1st Cir.1982; No. 82CA0328); Langford v. Calcasieu Parish Police Jury, 396 So.2d 956 (La. App. 3d Cir.1981); Farris v. Ducote, 293 So.2d 589 (La.App. 3d Cir.1974); writ ref., 295 So.2d 814 (La.1974). Based upon our review of the facts, we find that the trial court's determination that plaintiff was entitled to $5,400.00 of benefits clearly erroneous. For the reasons cited above, therefore, we reverse the judgment of the trial court and award judgment in favor of defendant, dispensing with the suspensive bond on appeal. All parties are to bear their own costs.
REVERSED AND RENDERED.